NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

IN RE TERMINATION OF PARENTAL
RIGHTS AS TO R.S.

No. 1 CA-JV 25-0066

FILED 11-28-2025

Appeal from the Juvenile Court in Maricopa County
No. JD535365
The Honorable Jay M. Polk, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant Christiana K.*

Denise L. Carroll, Scottsdale
By Denise L. Carroll
*Counsel for Appellant Timothy S.*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee Department of Child Safety*

Canizales Law PLLC, Phoenix
By Carrie Shew Canizales
*Counsel for Appellee Child R.S.*

---

**MEMORANDUM DECISION**

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge Michael S. Catlett joined.

---

**J A C O B S,** Judge:

¶1        Christiana K. ("Mother") and Timothy S. ("Father") appeal the juvenile court's ruling terminating their parental rights.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**A.        R.S. Is Born Substance-Exposed and Then Referred to the Department of Child Safety ("DCS").**

¶2        Mother and Father are the biological parents of R.S., who was born in February 2023.  Shortly after he was born, DCS received a report that R.S. was in the NICU experiencing withdrawal due to prenatal drug exposure.  Mother refused to take a urine toxicology test at the hospital but later told DCS that she used fentanyl, methamphetamines, and amphetamines throughout the last few months of pregnancy.  Father also admitted to a history of addiction, two prior convictions for drug-related offenses, and current fentanyl use one to two times a day.

¶3        In March 2023, DCS held a meeting to discuss continued concerns with the family's care for R.S. and enacted a safety plan where R.S.'s maternal grandmother ("Grandmother") was to live with the family and monitor all interactions of Mother and Father with R.S.

¶4        By July 2023, neither Mother nor Father were engaged in any of the services DCS offered them for recovery from drug use and could not articulate a barrier to completion.  Mother and Father both inconsistently completed their scheduled urine toxicology tests, and all tests completed were positive for fentanyl, methamphetamines, amphetamines, methadone, and THC in different variations.  The family also faced continued difficulties with housing stability.  Neither Mother nor Father were employed and had been on the verge of eviction twice since moving into their apartment in February 2023.

**B.      The Dependency Proceeding Begins.**

**¶5**          DCS filed a dependency petition on July 5, 2023.  R.S. was declared a temporary ward of the court at the initial dependency hearing on July 26, 2023, and further proceedings were continued for the purpose of Father establishing paternity.  At the hearing, the juvenile court provided Mother and Father with the "Form 1" warnings, advising them of the consequences of failure to appear at future dependency or termination hearings, including that "the court may find that you have waived your right to object to the termination of your parental rights," in which case, "[t]he court may then consider evidence in your absence and terminate your parental rights."  *See* Ariz. R. P. Juv. Ct. Form 1.

**¶6**          In September 2023, the juvenile court found R.S. dependent as to Mother "based on substance abuse and failure to care for the child's every day needs including housing."  R.S. remained at home with Mother and Father under Grandmother's supervision.  For several months, DCS continued to offer numerous services to Mother and Father, but neither meaningfully participated or made progress toward sobriety.  The juvenile court later affirmed paternity and found R.S. dependent as to Father in April 2024, citing "neglect due to substance abuse and instability."

**¶7**          Despite both parents' continued failure to engage in services or demonstrate progress toward sobriety, DCS allowed R.S. to remain in Mother's physical custody and affirmed its goal was still to help Mother and Father progress to where they could safely parent R.S. on their own.

**C.      DCS Removes R.S. From Mother's Custody.**

**¶8**          Mother tried to find an inpatient rehabilitation facility.  DCS helped Mother obtain a placement at an inpatient facility that would allow her to bring R.S. with her.  DCS helped ensure Mother did not lose her spot at the facility by:  (1) rescheduling her intake after it was cancelled when Mother failed to appear; (2) arranging transportation for Mother, R.S., Grandmother, and Mother's dog from Phoenix to the facility in Tucson; (3) waiting nearly two hours past the scheduled transport time for Mother to accept transportation; (4) communicating with the facility to extend Mother's intake window so she would not be rejected upon arrival due to her delayed departure; and (5) trying to find a home for Mother's dog because Mother had not arranged to board the dog, eventually driving the dog back to Father in Phoenix when the dog could not be placed in a shelter.

**¶9**          Mother completed intake at the inpatient facility on February 12, 2024.  Three days later, the facility contacted DCS asking if someone

could speak to Mother because she had called a taxi and wanted to leave the facility. A DCS investigator met Mother and told her leaving treatment could lead her to lose custody of R.S. Representatives of the facility tried to convince Mother to continue treatment there so they could supervise both her and R.S. Despite that, Mother left in a cab without R.S., knowing she could thus lose custody of R.S. R.S. was placed in foster care the next day.

¶10 DCS referred Mother and Father for supervised visits and further services to aid their progress toward sobriety and family stability. Both parents said they wanted to begin inpatient treatment but failed to follow through on referrals for residential treatment at Crossroads, CBI, and Vogue Recovery Center. Neither parent completed drug testing or engaged with Terros or Family Connections. And though Mother and Father initially participated in a few supervised visits with R.S., they did not visit or attempt to contact R.S. between March 21, 2024 and the February 21, 2025 hearing on DCS's motion to terminate their parental rights.

### D. After a Hearing Neither Parent Attends, the Juvenile Court Terminates Mother's and Father's Parental Rights.

¶11 DCS moved to terminate both parents' rights under A.R.S. §§ 8-533(B)(1) (abandonment), 533(B)(3) (chronic substance abuse) and 533(B)(8)(b) (six months out-of-home placement). Neither Mother nor Father appeared at the initial termination hearing on February 21, 2025, despite receiving notice and being advised of the consequences of failing to appear. Counsel asserted no good cause for their failure to appear. Mother's counsel asked the juvenile court to continue the hearing to make sure DCS's disclosures were up to date. The court found both parents' failure to appear without good cause an admission of the allegations in the termination motion and proceeded with the hearing in their absence. After the close of the evidence, the court granted the motion to terminate the parental rights of both Mother and Father. At the hearing, the juvenile court made these findings in support of granting DCS's motion to terminate:

¶12 As to A.R.S. § 8-533(B)(1) (abandonment), neither Mother nor Father had visited R.S. since March 21, 2024. Neither parent had been in contact with DCS since April 2024, despite many attempts by DCS to locate both parents. Neither Mother nor Father had attempted to contact R.S. and had not sent cards, gifts, or letters. As a result, neither of the parents have a normal parental relationship with R.S.

¶13 As to A.R.S. § 8-533(B)(3) (chronic substance abuse), R.S. was born withdrawing from fentanyl, methamphetamines, and amphetamines.

Mother and Father admitted to a prolonged history of substance abuse in interviews with DCS. Mother and Father continuously failed to make meaningful progress toward sobriety, failing to provide clean urinalysis results or to complete any services DCS offered them. Given their chronic substance abuse and inability to make progress toward sobriety, both Mother and Father are unable to parent, and the chronic substance abuse would continue for a prolonged period.

¶14 As to A.R.S. § 8-533(B)(8)(b) (six months out-of-home placement), R.S. had been in out-of-home placement for more than a year and was under three years old. Mother and Father had neglected or willfully refused to remedy the circumstances that caused R.S. to be placed in out-of-home care.

¶15 As to R.S.'s best interests, DCS had identified an adoptive placement for R.S. that could take care of his medical needs, including braces for club feet and tubes in his ears for chronic infections. If this placement does not work out, R.S. is adoptable. Given both parents' failure to show any interest in visiting or contacting R.S. for nearly a year, termination was in R.S.'s best interests.

¶16 The court also ordered that DCS file an affidavit confirming it had made all required disclosures and lodge a proposed order including findings of fact and conclusions of law by March 14, 2025. DCS filed its affidavit regarding disclosure on April 11, 2025, affirming that DCS did not find any undisclosed documents that existed "prior to the date the case [proceeded] to adjudication." DCS lodged its proposed findings of fact and conclusions of law that same day. The juvenile court signed the proposed order terminating both parents' rights on April 23, 2025.

¶17 Mother and Father timely appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 8-235, 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

**The Juvenile Court Did Not Err By Terminating Mother and Father's Parental Rights.**

¶18 "We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 10 (2021). A court may terminate parental rights where it finds: (1) a ground for termination under A.R.S. § 8-533(B) by clear and convincing evidence; and (2) termination is in the child's best interests by a preponderance of the

evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005); A.R.S. § 8-533(A)-(B). We apply a deferential standard under which "the juvenile court's legal conclusions regarding the statutory ground for termination . . . will be affirmed unless they are clearly erroneous." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478-79 ¶ 31 (2023).

**¶19** Neither parent disputes the factual basis for any of the three grounds for termination, nor the finding that termination is in R.S.'s best interests. Instead, Father argues DCS's failure to provide timely disclosure deprived him of a meaningful opportunity to contest severance or present evidence of his sobriety and progress in recovery. Mother argues the juvenile court deprived her of due process by accepting DCS's proposed findings of fact and conclusions of law in full, despite alleged factual inconsistencies. These arguments are unpersuasive, as we next explain.

## A. DCS's Untimely Disclosure Did Not Prejudice Father.

**¶20** We review the late disclosures for fundamental error because Father did not object to "the alleged due process violation[] in the juvenile court." *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 447 ¶ 37 (2018). "Under fundamental error review, [Father] 'bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused [him] prejudice.'" *Id.* at 447-48 ¶ 38 (quoting *State v. Bearup*, 221 Ariz. 163, 168 ¶ 21 (2009)).

**¶21** Procedural errors, including late disclosures, must be evaluated in the context of their impact on the fairness of the proceedings and the ability of the affected party to defend their interests. *See Dep't of Child Safety v. Carel G.*, ___ Ariz. ___, 573 P.3d 1120, 1127-28 ¶¶ 27-28 (App. 2025). Even assuming *arguendo* that Father satisfies the first two elements, he has failed to establish the alleged error caused him prejudice. *See Brenda D.*, 243 Ariz. at 448 ¶ 38 (The party asserting prejudice "'must affirmatively prove prejudice' and cannot merely 'rely upon speculation.'") (cleaned up).

**¶22** Father cannot prove prejudice because the late disclosures are not part of the record on appeal, and Father has not described their contents or explained how the untimely disclosure harmed his presentation of his case. Father does argue he would have offered evidence of his sobriety and progress in recovery. But that evidence would not rebut the court's findings of abandonment and six months out-of-home placement, or that termination was in R.S.'s best interests, which rested on the availability and adequacy of an adoptive placement. Finally, Father could have presented evidence of sobriety and recovery by appearing at the termination

adjudication hearing, or through his counsel in his absence, but he did neither. As such, the juvenile court did not abuse its discretion by terminating Father's parental rights. *See id.* at 448 ¶ 39 (finding parent who "'presented no evidence that a reasonable [judge] would have concluded differently than did the [juvenile court] judge' in this case . . . has not met [their] burden under fundamental error review") (quoting *Monica C. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 89, 95 ¶ 26 (App. 2005)).

**B.  The Juvenile Court Did Not Deprive Mother of Her Due Process Rights By Accepting DCS's Proposed Findings of Fact and Conclusions of Law.**

**¶23**  Mother contends the juvenile court abdicated its role as factfinder by accepting DCS's proposed findings of fact and conclusions of law, despite supposed inconsistencies within them. Not so. DCS may lodge, and the court may utilize, proposed findings of fact and conclusions of law in a termination order. *See Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 298 ¶ 25 n.3 (App. 2020); *see also Elliot v. Elliot*, 165 Ariz. 128, 134 (App. 1990) (allowing the trial court to "adopt proposed findings that the parties submit" so long as "those findings are consistent with the ones that it reaches independently after properly considering the facts"). We consider each of the three inconsistencies Mother notes, none of which justify vacating the juvenile court's termination decision on appeal.

**¶24**  *First*, the order states that parties received an admonition on February 5, 2025 as to the consequences of failing to appear. Mother correctly notes the juvenile court instead relied on admonitions given on July 26, 2023. But so long as the juvenile court finds "the parent was warned that 'the hearing could go forward in the absence of the parent' and that 'failure to appear may constitute a waiver of rights,'" it can proceed in the parent's absence. *Brenda D.*, 243 Ariz. at 443-44 ¶ 22. These findings do not need to be formally incorporated in the final written termination order. *See* Ariz. R.P. Juv. Ct. 353(f), (h). Thus, where Mother was properly advised of the consequences of failing to appear (but the court recorded the date incorrectly), and where the advisement need not appear in the final order, the fact that the wrong date of the properly given advisement appears in the final order is no abridgment of fundamental fairness.

**¶25**  *Second*, the order recites that R.S. currently resides in an adoptive placement, while testimony at the termination adjudication hearing reflects that while DCS had found an adoptive placement for R.S., he was not yet residing there. Despite this error, the order correctly concludes that termination is in R.S.'s best interests because his caregivers

are familiar with his medical needs and would provide a calm and consistent home, and that R.S. was adoptable. These findings of fact are sufficient to uphold the juvenile court's conclusion of law that termination was in R.S.'s best interests. *See Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 537 ¶ 14 (App. 2018) ("[T]he order must specify the juvenile court's conclusions of law and 'at least one factual finding sufficient to support each of those conclusions of law.'") (cleaned up).

¶26 *Third*, Mother alleges the termination order's reference to a narcotics offense and a related warrant for Mother's arrest in its findings of fact lacks record support, calling into question the chronic substance abuse ground for termination. But many facts Mother does not question support the statutory ground of chronic substance abuse: R.S. was born withdrawing from several addictive substances; Mother consistently failed to complete substance abuse treatment or provide clean urine toxicology; and Mother left the inpatient detox treatment against staff advice. These findings are reasonable evidence supporting the substance abuse ground for termination. *See Brionna J.*, 255 Ariz. at 478-79 ¶ 31.

¶27 Alternatively, Mother argues that if there was a narcotics offense and a related warrant, that would tend to negate the juvenile court's finding of abandonment, citing *In re B.W.*, ___ Ariz. ___, 572 P.3d 88, 97 ¶ 27 (2025) (holding Father may have "just cause" to rebut presumption of abandonment despite not pursuing time with child because counsel "advised him that these acts would likely jeopardize his chance of prevailing at his criminal trial"). This argument lacks merit. Mother was not acting on advice of counsel when she concededly "complete[ly] fail[ed] to appear and testify," or contact R.S. for the eleven months preceding the termination adjudication hearing. Mother has no "reasonable and fair justification for not maintaining a normal parental relationship with" R.S. nor has she suggested any such justification. *Id.* at 96 ¶ 24. The juvenile court neither abused its discretion by finding Mother abandoned R.S., nor deprived Mother of due process by entering its termination order.

**CONCLUSION**

¶28 We affirm.

